UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.

TIMOTHY BURKE

Case No. 8:24-cr-68-KKM-TGW

## DEFENDANT TIMOTHY BURKE'S OPPOSITION TO GOVERNMENT'S MOTION TO ENJOIN PUBLICATION OR USE OF SEIZED EXPRESSIVE MATERIALS

Comes Now, Defendant TIMOTHY BURKE, by and through the undersigned counsel and respectfully opposes the government's sweeping and unprecedented motion to keep secret vital information related to this case. [1] In support whereof, Defendant states as follows:

1. Citing the rules on discovery, the rights of Fox News to privacy, and copyright law, the government asks this court to issue an injunction (prior restraint) to continue to prevent a journalist[2] from publishing *his own returned*

---

[1] This response is in addition to the previously filed objections to a wholesale protective order relating to alleged "personal information" and "trade secrets" (Doc. 39)(May 13, 2024) These objections raise substantially different issues and bases for objection and therefore are filed separately. A hearing on this Motion is currently set for May 31, 2024. (Doc. 43).

[2] "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Since the government seized his newsroom on May 4, 2023, Mr. Burke has been unable to publish the materials the government seeks to cover by the protective order.

*copies* of newsworthy reporting, labeling reportage as "stolen" information and "contraband." The government asserts (Doc 33, p 8-9):

> The United States is likewise in possession of information found on Burke's computer system that was stolen from a StreamCo-Net computer, which Burke had accessed using other compromised credentials, as alleged in Count One (see ¶¶ D.23.d-h) and in Counts Two through Seven. Id. Relatedly, the investigative team located on Burke's system approximately 1,073 files (approximately 87.15 GB) that contain all or part of what appears to be intercepted and stolen wire communication streams of NW-1, NW-2, and other victim entities, as charged in Count One and in Counts Eight through Twelve.15, 16 Id. Affected Victim Entities have explained to the United States that video streams created by or for said Victim Entities (and others) but stolen and downloaded by the conspirators are subject to copyright protection and should be safeguarded.

1. **An Injunction Against Publication is an Almost Unprecedented Action**

2. The proposed protective order is a prohibited "prior restraint" on publication based on the erroneous presumption that Mr. Burke's reporting materials are "stolen." [3] To enjoin a journalist from the publication of his own information -- however acquired -- the government must meet the high burden for prior restraint established in *Nebraska Press Assn. v. Stuart*, 427 US 539 (1976) and *Near v. Minnesota ex rel. Olson*, 283 US 697 (1931) where the Court noted that prior

---

[3] "Temporary restraining orders and permanent injunctions—i.e., court orders that actually forbid speech activities—are classic examples of prior restraints." *Alexander v. United States*, 509 U.S. 544, 550, 113 S. Ct. 2766, 2771, 125 L. Ed. 2d 441 (1993); *Rodgers v. U.S. Steel Corp.*, 536 F.2d 1001, 1008 (3d Cir. 1976)(even if information is stolen, this does not justify a prior restraint on publication);

restraints may be issued in rare cases, such as when it is necessary to prevent the publication of troop movements during wartime, the publication of obscene material, or to prevent the overthrow of the government. *Id.* Even in times of war, however, the issuance of prior restraints has been limited. See *New York Times Co. v. U.S.*, 403 U.S. 713, 726-27 (1971) (Brennan, J. concurring) (an alleged threat of "grave and irreparable injury" to national security is too speculative to justify prior restraint on speech). Ultimately, "[b]efore a prior restraint may be imposed by a judge . . . there must be an imminent, not merely likely, threat" and "[t]he danger must not be remote or even probable; it must be immediately imperil." *U.S. v. Columbia Broad. Sys., Inc.*, 497 F.2d 102, 104 (5th Cir. 1974) (quoting *Craig v. Harney*, 331 U.S. 367, 376 (1947)). To justify a prior restraint, the state must have an interest of the "highest order" it seeks to protect, *Fla. Star v. B.J.F.*, 491 U.S. 524, 533 (1989); the restraint must be the narrowest available to protect that interest; and the restraint must be necessary to protect against an evil that is great and certain, would result from the reportage, and cannot be mitigated by less intrusive measures. *CBS, Inc. v. Davis*, 510 U.S. 1315, 1317 (1994).

3.  Journalists are frequently accused of publishing – or attempting to publish – materials that were acquired without the consent of the originator of that information – what the government here calls "stolen" information.  In *New York Times Co. v. United States*, 403 U.S. 713 (1971), the Pentagon Papers case,  the Court

specifically held that the Department of Justice could not prevent publication of classified and stolen information [4] by the New York Times and the Washington Post on the ground that this information was "stolen." Indeed, in cases ranging from the Pentagon Papers, the Panama Papers, the Wikileaks papers, the SONY emails, the "Blueleaks" hack of government records, the "ClimateGate" leaks, the "Biden laptop" leak, and myriad other instances of reporters reporting on information obtained through leaks, whistleblowers, hacks or other forms of alleged "theft" or "misappropriation" or obtaining information or publishing it without consent. [5] This is particularly true when the information is of current newsworthiness. [6] Indeed, the Department of Justice itself is often the beneficiary

---

[4] See also, *United States of America v. Progressive, Inc.*, 467 F. Supp. 990 (W.D. Wis. 1979)(injunction dissolved against publishing a "how to" build a nuclear bomb); *Bank Julius Baer & Co. v. WikiLeaks*, 535 F. Supp. 2d 980, 985 (N.D. Cal. 2008)(denying injunction against publication of WikiLeaks information because "it is clear that in all but the most exceptional circumstances, an injunction restricting speech pending final resolution of the constitutional concerns is impermissible."); *Snepp v. United States*, 444 U.S. 507 (1980)(government contract with former CIA employee mandating prepublication review of classified information enforceable through injunction); *United States v. Marchetti*, 466 F. 2d 1309 (4th Cir. 1972)(same); *CBS Inc. v. Davis*, 510 U.S. 1315 (1994)(no injunction on publication on materials obtained "through the "calculated misdeeds" of CBS).

[5] Erik Ugland & Christina Mazzeo, Hacks, Leaks, and Data Dumps: The Right to Publish Illegally Acquired Information Twenty Years After *Bartnicki v. Vopper*, 96 Wash. L. Rev. 139 (2021) available                                                                                                          at https://digitalcommons.law.uw.edu/cgi/viewcontent.cgi?article=5158&context=wl

[6] See, *Trump v. Trump*, 69 Misc. 3d 285 - NY: Supreme Court, Dutchess 2020 (attempted injunction to prevent Mary Trump from publishing book "Too Much and Never Enough, How My Family Created the World's Most Dangerous Man").

of online leaks of information and uses the information from these leaks and hacks

routinely in criminal and civil cases.[7] This is not a ground for prior restraint.

4. In *Fort Wayne Books, Inc. v. Indiana*, 489 US 46, 63-64 (1989) the Court noted:

> … while the general rule under the Fourth Amendment is that any and all contraband, instrumentalities, and evidence of crimes may be seized on probable cause (and even without a warrant in various circumstances), it is otherwise when materials presumptively protected by the First Amendment are involved. *Lo-Ji Sales, Inc. v. New York*, 442 U. S. 319, 326, n. 5 (1979). It is "[t]he risk of prior restraint, which is the underlying basis for the special Fourth Amendment protections accorded searches for and seizure of First Amendment materials" that motivates this rule. *Maryland v. Macon,* 472 U. S. 463, 470 (1985). *supra*, These same concerns render invalid the pretrial seizure at issue here.

5. There has never been an adversarial hearing or a finding that the materials

are, in fact "stolen" or "contraband."[8] This is not unlawful narcotics, nuclear

secrets, child pornography or obscenity. It is reportage - seized by the government.

## 2.    The Government has Seized and Seeks to Prevent Publication of Journalistic Materials

---

[7]*United States v. Jarrett*, 338 F. 3d 339 (4th Cir., 2003)(the Government used information provided by an anonymous computer hacker to initiate a search); *United States v. Kramer,* 75 F. 4th 339 (3rd Cir., 2023); *United States v. Steiger*, 318 F.3d 1039, 1045 (11th Cir. 2003); *United States v. Rosenow,* 50 F.4th 715, 731 (9th Cir. 2022); *United States v. Koerber*, 10 F.4th 1083, 1114 (10th Cir. 2021).

[8] "…only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid final restraint." *Freedman v. Maryland*, 380 U.S. 51, 58 (1965). Thus, if material protected by the First Amendment is removed from circulation without these procedural protections, the seizure is invalid as a prior restraint." *Ctr. For Democracy & Tech. v. Pappert*, 337 F. Supp. 2d 606, 656 (E.D. Pa. 2004)

6.  This case is entirely about journalism. The crime charged is finding and reporting on information -- allegedly without permission. The materials seized are reporting materials. On October 6, 2022, former Fox News "host" Tucker Carlson[9] broadcast the first part of a two-part interview of rapper, influencer and claimed Presidential candidate Kanye West ("Ye") about a broad range of topics. [10] What later became newsworthy, however, was the fact that Fox News had edited out significant portions of Ye's remarks to create a false impression to the viewers of Ye's and Carlson's state of mind.[11]

---

[9] The government, in the Affidavit in support of the warrant, the Indictment, and its pleadings has chosen not to disclose the identity of any of the witnesses or participants in the actions alleged, other than Mr. Burke.  We decline to follow suit, and provide the Court with the context in which this matter should be considered. Nothing in 18 USC 3771(8) requires the Court to operate in the dark about the nature of the case, or the fact that this involves major media outlets' efforts to suppress truthful information.

[10] Fox News put the interview up on its website with the appellation "Tucker Carlson: Is Kanye West crazy? You be the judge" with Carlson himself observing:

> But is West crazy? You can judge for yourself as you watch what we're about to show you. He has his own ideas, we can say that. Creative people tend to. That's why they're artists, not actuaries. His free-form social media post gives the impression of a maning [sic] his rawest emotions right onto Instagram.
> The effect can be jarring and it is often used as ammunition against him in the battle for influence over the minds of America's young people and that battle is intense.
> But crazy? That was not our conclusion.
> In fact, we've rarely heard a man speak so honestly and so movingly about what he believes, but again, you can judge for yourself.

https://www.foxnews.com/transcript/tucker-carlson-kanye-west-crazy-judge (last visited May 6, 2024)

[11] Apparently, editing videos to make Carlson and his guests seem more palatable is a pattern for the former Fox commentator. See, Tucker Carlson Removed Portions Of YouTube Version Of Aaron Rodgers Interview, May 17, 2024 available at https://angrywhitemen.org/2024/05/17/tucker-carlson-removed-portions-of-youtube-version-of-aaron-rodgers-interview/ (last visited, May 18, 2024) ("On a recent episode of his online show, Tucker Carlson interviewed NFL quarterback and anti-vaxxer Aaron Rodgers. The

7.   On October 11, 2022, Vice News broadcast unedited portions of the Carlson/Ye interview, including Ye's antisemitic rants about Jewish people and bizarre claims about "fake children," as well as describing visions of "kinetic energy" cities sent to Ye by God.[12] The full, unedited Carlson/Ye interview was certainly a matter of public interest and was widely reported on. It was a contributing factor to Ye losing a $1.5 billion deal with sportswear giant Adidas,[13] and in the ultimate decision by Fox News to fire Tucker Carlson - its most popular commentator at the time. [14]

8.   At around the same time, Media Matters for America also broadcast other live videos of Tucker Carlson [15] engaging in misogynistic behavior with women,

---

interview was broadcast on both YouTube and X (formerly Twitter). However, Carlson surreptitiously cut several portions out of the YouTube version in which the pair push conspiracies about vaccines and population control.")

[12] It includes a reference to going "death con 3" [sic] on "JEWISH PEOPLE," and allegations that Margaret Sanger, the founder of Planned Parenthood, was a "known eugenics," and that the organization was created by the KKK "to control the Jew population." Ye added "When I say Jew, I mean the 12 lost tribes of Judah, the blood of Christ, who the people known as the race Black really are. This is who our people are. The blood of Christ. This, as a Christian, is my belief." See, Anna Merlan, Watch the Disturbing Kanye Interview Clips That Tucker Carlson Didn't Put on Air, Vice News, October 11, 2022, available at https://www.vice.com/en/article/3ad77y/kanye-west-tucker-carlson-leaked-footage-antisemitism-fake-children (last visited May 6, 2024)

[13] Megan Twohey, Kanye and Adidas: Money, Misconduct and the Price of Appeasement, New York Times, Oct. 27, 2023 available at https://www.nytimes.com/2023/10/27/business/kanye-west-adidas-yeezy.html (last visited May 6, 2024).

[14] Why did Fox News fire Tucker Carlson? Los Angeles Times, April 24, 2023 available at https://www.latimes.com/entertainment-arts/story/2023-04-24/la-new-fox-news-fires-tucker-carlson-explainer (last visited May 6, 2024).

[15] Matt Gertz, FOXLEAKS: Tucker Carlson asks makeup artist if "pillow fights ever break out" in the women's bathroom, Media Matters (May 4, 2023) available at https://www.mediamatters.org/fox-news/foxleaks-tucker-carlson-asks-makeup-artist-if-pillow-fights-ever-break-out-womens-bathroom (last visited May 6, 2024).

including asking Fox cosmeticians whether they had "pillow fights" in ladies room, discussing his "postmenopausal fans," describing a woman as "yummy," and telling a colleague preparing to interview him, "If we're going to talk about sex, I'd love to hit some of the fine points of technique." Carlson was also shown criticizing Fox's Fox Nation streaming service and describing the lawyer who deposed him that day for the Dominion Voting Systems lawsuit against Fox as a "slimy little motherf*****."[16] The latter is particularly significant as it may be part of other comments by Carlson which would be material in the still ongoing voting lawsuits. It was this reporting that raised the ire of Fox News and its lawyers who tried to suppress it. [17]

9.  Fox's lawyers also retained a Forensics firm to investigate the publications, who conducted the bulk of the investigation which resulted in both the seizure and the Indictment.[18] The Tampa prosecutors issued document preservation

---

[16] Matt Gertz, FOXLEAKS: Tucker Carlson on getting "triggered" by Dominion's deposition lawyer: "That slimy little motherfucker" Media Matters (May 3, 2023) available at https://www.mediamatters.org/fox-news/foxleaks-tucker-carlson-getting-triggered-dominions-deposition-lawyer-slimy-little (last visited, May 6, 2024).

[17] On May 5, 2023, Fox's lawyer, Christopher Chiou of Wilson Sonsini Goodrich & Rosati attempted to force entities like Media Matters and Vice News to remove the content – alleging that the video had been "stolen." Chris Panella, Fox News' lawyers send cease and desist to stop Media Matters from publishing leaked videos of Tucker Carlson's comments, Business Insider, May 5, 2023, available at https://www.businessinsider.com/fox-news-lawyers-cease-desist-media-matters-tucker-carlson-leaks-2023-5 (last visited May 6, 2024). Media Matters President and Chief Executive Officer Angelo Carusone responded by noting "Reporting on newsworthy leaked material is a cornerstone of journalism. For Fox to argue otherwise is absurd and further dispels any pretense that they're a news operation." Id.

[18] The search warrant affidavit makes it clear that the DOJ investigation was triggered by, and the result of the DFIR investigation by Fox News. Affidavit, Par. 14 "The investigation by [Stroz

demands to Vice News and Media Matters indicating its intent to subpoena records relating to their respective broadcast of information that embarrassed Tucker Carlson and Fox News.[19]

10. The information sought to be suppressed was not "stolen" "hacked" or "intercepted." It was located on a publicly accessible, Internet addressable, unencrypted website, just like hundreds of other live video feeds.  The only difference was that the URL of this feed was not well known. As former federal computer crime prosecutor Orin Kerr observed, "A hard-to-guess URL is still a URL, and the information posted at that address is still posted and accessible to the world" [20]

11. Journalists frequently search for, find and publish "hidden" information online, including a Scripps Howard reporter finding hidden information about the "Lifeline" phone program, [21] an AP reporter using "directory transversal" to find

---

Friedberg] revealed the information contained below in paragraphs 26 through 30 of this affidavit."

[19] Oliver Darcy, Justice Department opens criminal hacking probe into leaked Tucker Carlson videos, CNN Business
May 26, 2023, available at  https://www.cnn.com/2023/05/26/media/tucker-carlson-doj-criminal-hacking-probe/index.html (last visited May 6, 2024)

[20] Orin S. Kerr, Norms of Computer Trespass, 116 Colum. L. Rev. 1143, 1164–65 (2016) cited in *Davis v. HDR Inc.*, 652 F. Supp. 3d 1087, 1093–95 (D. Ariz. 2023), appeal dismissed, No. 23-15233, 2023 WL 5367499 (9th Cir. May 10, 2023)

[21] Gerry Smith, Scripps Employees Called 'Hackers' For Exposing Massive Security Flaw, Huffington Post, May 22, 2013, https://www.huffpost.com/entry/scripps-reporters-hackers_n_3320701 Isaac Wolf, a reporter for Scripps Howard News Service discovered that these companies had exposed online completed customer applications including customers' Social Security numbers and dates of birth. When he published this fact, the companies threatened to sue him under the civil provisions of the Computer Fraud and Abuse Act.

and disclose the contents of the unreleased Sandy Hook 911 tapes; [22] the "Friends of the City of Fullerton" exposing hidden Dropbox folders; [23] the AP finding a pre release copy of a judicial opinion "parked" online [24] and St. Louis Post-Dispatch reporter Josh Renaud's finding information inadvertently exposed by a State-run teacher licensing website. [25]

---

[22] In 2013, when the State of Connecticut was forced by a lawsuit by the Associated Press to release the 911 tapes related to the Sandy Hook (Newtown) massacre, the State announced that it would post the tapes to a website http://www.newtown-ct.gov/public_documents/newtownct_police/index. Using a technique called "directory transversal" or "directory climbing," an AP reporter simply removed the word "index" from the URL, and was able to explore the file directory and find a folder that was not publicized (but publicly accessible) where the police kept the 911 tapes, which he downloaded and reported on.

[23] [The blogger] routinely requested public records, and the city had provided him with a link to the Dropbox folder in the past, he told CPJ. The city acknowledges sending a link to access the folder in response to records requests, according to court filings reviewed by CPJ. The folder was not password protected, and anyone could access it via the web address in the link. Files that were approved for public release were kept in the same folder as others that had not been, some of which were password protected, according to those documents. The complaint said [the journalists] accessed files in the folder that had not been approved for release, thereby violating the Computer Fraud and Abuse Act (CFAA),https://cpj.org/2019/12/fullerton-journalists-sued-hacking-dropbox/ The police were required to return the seized Dropbox files and pay the costs and legal fees of the advocates.

https://www.eff.org/files/2021/01/06/g058996_friends_for_fullerton_v._fullerton_amicus_brief.pdf See also, Fullerton journalists sued for "hacking" city's open Dropbox folder, Committee to Protect Journalists,
December 20, 2019 available at https://cpj.org/2019/12/fullerton-journalists-sued-hacking-dropbox/ (last visited, May 10, 2024).

[24] Ted Bridis, Court Posts Microsoft Ruling on Web, Associated Press Online (November 1, 2002) available at https://www.govtech.com/archive/court-posts-microsoft-ruling-on-web.html (last visited May 10, 2024)

[25] Jason Hancock, Claim that reporter hacked state website was debunked. Parson still says he's a criminal, Missouri Independent, Feb. 23, 2022, available at https://missouriindependent.com/2022/02/23/claim-that-reporter-hacked-state-website-was-debunked-parson-still-says-hes-a-criminal/ (last visited May 10, 2024)The governor accused the reporter of hacking and the newspaper of using the incident to embarrass him, and ordered the Missouri Highway Patrol to investigate the journalist. The prosecutor ultimately determined that the hacking statute was too vague to prosecute a journalist for reporting on information found in the public domain. Jason Hancock Prosecutor: No 'criminal intent' by reporter Missouri governor

### 3.    The Live Feeds Were Neither Unlawfully "Intercepted" nor "Stolen"

12. The forty-four page affidavit unsealed in May 3, 2024, (Doc 58) can be summarized by examining three relevant paragraphs which describe the government's theory of criminality. [26] Paragraph 20 notes:

> Through open source research it was determined that [web streaming service LiveU.tv] network user credentials and an associated password that had been designated to [CBS News] were exposed on a radio-station website of a [CBS News}] radio affiliate in Tennessee [WGNS]. Said credentials were exposed as early as January 16, 2022, and were found on the Internet Archive (the Way Back Machine.)[27]

13. Par. 30, further notes:

> The research by [Stroz Friedberg division of AON Insurance, the Digital Forensics and Incident Response company hired by Fox News' law firm Wilson, Sonsini] further revealed that a violator using the IP address [associated with journalist Timothy Burke][28] entered [LiveU.tv's] restricted computer network

accused of hacking, Missouri Independent, February 21, 2022 available at https://missouriindependent.com/2022/02/21/prosecutor-no-criminal-intent-by-reporter-missouri-governor-accused-of-hacking/ ("If any crime was committed, it was in the "fringes" of an overly-broad state law and "wasn't going to be worth the time, the effort or, quite frankly, the taxpayer dollars to pursue.")

[26] For almost a year, the government has resisted Mr. Burke's efforts to seek return of his reporting materials, asserting that even disclosure of the contents of the Affidavit in support of the warrant would cause harm to the ongoing investigation and reveal the names of victims and witnesses -, yet, the Affidavit contains no such names. See, e.g., *Burke v. United States*, No.8:23-mc-00014-WFJ-SPF (M.D. Fl., 2023) (appeal dismissed for lack of jurisdiction) Dkt. No. 23-13649-H (11th Cir., May 24, 2024)(unpublished)(in which Mr. Burke appeals the denial of his motion for return of the seized property pursuant to F.R. Crim. P. 41(g)).

[27]                                    Available                                    at https://web.archive.org/web/20220116173451/https://www.wgnsradio.com/article/54354/links (last visited on May 9, 2024). The website not only posted the userid and password, but helpfully noted that the posted password was "case sensitive" for anyone who chose to use it.

[28] The affidavit made it clear that Mr. Burke made no effort to hide or conceal the fact that he was viewing or downloading this information, using the same IP address as he registered for his businesses and personal accounts.

environment using the [WGNS Radio] credentials without authorization. Once there, the violator had access to [LiveU's] system of URL-based video feeds and, with that knowledge, could determine the non-public URL-based video feeds and, with that knowledge, could determine the non-public URL and the [LiveU.tv] specific identifier for [Fox News], which would then have allowed the violator to contemporaneously intercept the live electronic video feed, eavesdropping on the conversation between [Tucker Carlson] and [Kanye "Ye" West] without authorization. Investigation to date leads your affiant to believe that the violator then recorded the interview and disseminated the contents of the electronic communication without authorization.

14.  The Affidavit further asserts "Live streams are encrypted from *point to point;* however, the HLS live streams [29] pass through the [LiveU.tv] server while in transit, where *they are decrypted* [30]in low resolution making it viewable for the purpose of quality management. The signal is then encrypted again and continues to the receiver at the final location where it is recorded and stored in normal high-resolution format." Par. 34

---

[29] HLS is HTTP Live Streaming, or Hypertext Transfer Protocol Live Streaming, or more simply, a protocol for streaming video content over the Internet. See, https://www.cloudflare.com/en-gb/learning/video/what-is-http-live-streaming/ ("HTTP live streaming (HLS) is one of the most widely used video streaming protocols. Although it is called HTTP "live" streaming, it is used for both on-demand streaming and live streaming. HLS breaks down video files into smaller downloadable HTTP files and delivers them using the HTTP protocol. Client devices load these HTTP files and then play them back as video."

[30] This demonstrates the difference between "point to point" encryption (P2PE) which can be published in an unencrypted form, and "end to end" encryption (E2EE), which is encrypted throughout its journey from source to destination. https://topic.alibabacloud.com/a/the-difference-between-point-to-point-and-end-to-end_8_8_20180809.html For our purposes, P2PE means that, at the time Mr. Burke is alleged to have viewed the videos, they were unencrypted and publicly accessible (between two unencrypted points). In short, they were public.

15. To translate from "techspeak" to English, the government's theory is that Mr. Burke was provided a link to a webpage of WGNS Radio that had been archived to the Internet Archive.[31] On the WGNS Radio archived webpage was a link to the website https://matrix.liveu.tv (a website that hosts live video streams) and underneath it, the published *demo user id* and password[32] for people to use to log into that website. These credentials were published *by their owner*, much the same way Starbucks posts its Wi-Fi password on the shop wall, [33] or

---

[31] The FBI affiant asserts that the affiant found this archived website "using open-source research" -- or a simple Google search.

[32] A "demo" credential typically provides access to an account set up to permit users to "try out" a service or product. Unlike user defined credentials, demo credentials are typically assigned by the service itself, consist of a single credential for all users, is freely shared both internally and externally, and uses a userid and password associated with the user - like the userid for access to http:.//matrix.liveu.tv being "" or a password being CBSnews!!. Par. 38 of the Affidavit specifically notes, "that the credentials, [cbs-matrix-demo] are used at [CBS] for demonstration purposes…"

[33] Lest it be thought that this concern is fanciful, several people have been prosecuted for accessing unsecured Wi-Fi connections. The absurdity of such prosecutions was mocked by the Colbert Report, "Nailed 'Em; Cyberterrorists" October 2, 2007 available at https://www.cc.com/video/berne3/the-colbert-report-nailed-em-cyberrorists (last visited, May 17, 2024). This is not an isolated incident. Joe Reiss, Wireless Squatters Please Stand Up, Fordham Intellectual Property, Media and Entertainment Law Journal, April 4, 2009 available at http://www.fordhamiplj.org/2009/04/04/wireless-squatters-please-stand-up/ (last visited, May 17, 2024);
Eric Bangeman, Florida man charged with felony for wardriving; Be careful accessing those unprotected WAPs, especially if you live in Florida …, Ars Technica, July 7, 2005 available at https://arstechnica.com/uncategorized/2005/07/5068-2/ (last visited, May 17, 2024);Antone Gonsalves, Illinois Man Fined For Piggybacking On Wi-Fi Service, TechWeb Technology News, March 24, 2006 (archive version available at https://web.archive.org/web/20070525103850/http://www.techweb.com/wire/183702832) last visited May 17, 2024; Cheng, Jacqui (2007-05-22). "Michigan man arrested for using cafe's free Wi-Fi___33 from his car". Ars Technica. https://arstechnica.com/tech-policy/2007/05/michigan-man-arrested-for-using-cafes-free-wifi-from-his-car/ (last visited May 18, 2024); Wellner, Andrew (2007-02-24). "Using free wireless at library described as theft". Anchorage Daily News. April 3, 2007.

shared much the same way millions of "Netflix" credentials are shared by their owners.[34]  The credentials in this case were not stolen, hacked, or "compromised." They were published.

16. According to the Affidavit, when the journalist used the published demo credentials to log into the LiveU.tv site, the journalist saw *a list of website addresses (URL's)*. This list of URL's was automatically downloaded to all visitors.

17. The Affidavit asserts that the list was a list of "non-public URLs." These URL's were not behind a firewall, on an Intranet, encrypted, or anything other than publicly accessible. No userid or password (not even that of LiveU.tv) were required to access the live streams.[35]  They were not "secret" streams -- their address was merely <u>obscure.</u>  Anyone with the address could view the streams which required no userid or password, and which were *indistinguishable from hundreds of other television live streams freely available to view online.* [36] Capturing

---

[34] Benjamin Kweskin, Netflix and No Chill: The Criminal Ramification of Password Sharing, 1 Bus. Entrepreneurship & Tax L. Rev. 216 (2017)

[35] "Live streams" are the unedited content of materials generated on camera and broadcast between the camera operator and some other location - either within the same room or building, or remotely. Much of this content is simply video of an empty chair in a studio, but there is often newsworthy content contained in this material. Dozens of broadcasters - including major US television news and sports broadcasters -- routinely stream their live content on the public Internet. Indeed, much of Mr. Burke's award winning journalism — including his reporting about Sinclair Broadcast Group, NBC Olympics censorship, and events at the U.S. Capitol on Jan. 6, 2021 — has come from public live streams of broadcasts.

[36] Live video feeds of news, sports, and entertainment can be found with simple Google searches. These include NBC News https://nbcnewslive.akamaized.net/hls/live/2093243/nbc_live1/index_750.m3u8; C-SPAN https://dotorg1.c-spanvideo.org/out/v1/87a3832998f64638a8f0db091cc1b8db/index.m3u8;

these live streams is expressly permitted by 18 USC 2511, where, as here, the communications are transmitted through a service that has been configured to be readily accessible to the general public.  It matters not whether this was Fox News' intention.

18.  As the Court noted in *In re Innovatio IP Ventures, LLC Pat. Litig.*, 886 F. Supp. 2d 888, 892–94 (N.D. Ill. 2012)

> "The public's lack of awareness of the ease with which unencrypted Wi–Fi communications can be intercepted by a third party is, however, irrelevant to a determination of whether those communications are 'readily accessible to the general public.'" 18 U.S.C. § 2511(2)(g)(i). The language of the exception does not, after all, refer to "communications that the general public knows are readily accessible to the general public." [37]

## 4.    Mr. Burke Has A Constitutional Right to Publish the Live Streams

19.  In *Bartnicki v. Vopper,* 532 U.S. 514 (2001) the Supreme Court squarely held that, despite the prohibitive language in the statute, a journalist had a Constitutional right, under the First Amendment, to use, publish or disclose the contents of communications that they knew or had reason to believe had been

---

ABC                    News                    https://abcnews-streams.akamaized.net/hls/live/2023560/abcnews1/master_800.m3u8
CBS                    News                    https://cbsn-la.cbsnstream.cbsnews.com/out/v1/57b6c4534a164accb6b1872b501e0028/master.m3u8 and the
Associated                    Press                    http://streaming-a-806.cdn.nextologies.com/Ugg7ohj1KOol2v04/live_LZhmmII6x8GR7I3ig3zQ/AP_FEED_1_1000k/chunks.m3u8.

[37] The Court went on to note that "the public's expectation of privacy in a particular communication is irrelevant to the application of the Wiretap Act as currently written." *Id*.  We note that here, the Fox unencrypted communications were accessible to anyone with the web address and required no technology other than a browser and a media viewer.

created in violation of the wiretap statute. As the *Bartnicki* court noted, "As a general matter, "state action to punish the publication of truthful information seldom can satisfy constitutional standards." *Smith v. Daily Mail Publishing Co.,* 443 U. S. 97, 102 (1979)." Id. at 526-27. The Court went on to note that if "the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category." Id. at 527. [38] The *Bartniki* court concluded that the wiretap statute was unconstitutional as applied to the actions of a journalist disseminating unlawfully created recordings - even where the journalist had reason to know they had been created unlawfully.

20. Of course, in *Bartnicki*, "the broadcasters [] engaged in no unlawful activity other than the ultimate publication of the information another had previously obtained. They "neither encouraged nor participated directly or indirectly in the interception." *Id.* In *Democratic National Committee v. Russian Federation,* 392 F. Supp. 3d 410, 434-35 (S.D. N.Y., 2019) the District Court extended *Bartniki* to provide a First Amendment right to publish information even when the publisher was in "active collaboration" with the person who allegedly stole the information, or where the publisher solicited the theft of the information.

---

[38] Accord, *Netchoice v. Attorney General, Florida,* 34 F. 4th 1196, 1216-17 (11th Cir., 2022) noting that "dissemination of information" is "speech within the meaning of the First Amendment" citing *Ark. Educ. TV Comm'n v. Forbes,* 523 U.S. 666, 674 (1998) and *Sorrell v. IMS Health Inc.,* 564 U.S. 552, 570 (2011). See also, *Otto v. City of Boca Raton, Florida,* 981 F. 3d 854, 866 (11th Cir., 2020)

21. The government would distinguish *Bartnicki*, *Peavy* and *DNC* cases, because in those cases, there was no allegation that the journalists themselves created the illegal recording.  But *Mr. Burke did not create the recordings here* either -- they were created with the knowledge and consent of all of the participants. [39]  The allegation here is not that the Fox News live feeds were made unlawfully, but that Burke watched them (acquired the contents) "without authorization" of Fox News.

22. Even if true, that is not a crime, if, *as the Affidavit demonstrates*, the server was configured to be readily accessible to the public. [40]  In *Snow v. DirecTV, Inc.*, 450 F. 3d 1314, 1320-21 (11th Cir. 2006) the Court noted that:

> … the ECPA explicitly reads, "It shall not be unlawful under this chapter or chapter 121 of this title for any person—(i) to intercept or access an electronic communication made through an electronic communication system that is configured so that such electronic communication *is readily accessible to the general public*." 18 U.S.C. § 2511(2)(g) (emphasis added). Chapter 121 refers to the SCA. ECPA § 201. The legislative history and the statutory structure clearly show that Congress did not intend to criminalize or create civil liability for acts of individuals who "intercept" or "access" communications that are otherwise readily accessible by the general public.

---

[39] See, *Walker v. Darby*, 911 F. 2d 1573, 1579 (11th Circuit 1990) (in a wiretapping case, "the issue is whether a question of fact remained for trial regarding whether Jessie Walker had a subjective expectation that conversations taking place near his case were free from interception.") Both Mr. Carlson and "Ye" were mic'd up, sitting in a studio, facing a camera, with a red light on. Even if they did not expect that their candid conversations were being "broadcast" online at that time, to think that they had an expectation that they were not being captured (intercepted) does not square with the recording environment of the studio. *Cross v. State of Ala.*, 49 F. 3d 1490, 1508-09 (11th Cir. 1995)(Plaintiff "must prove that (1) [Defendant] intercepted her oral communications, (2) [Plaintiff] had an expectation that her oral communications were not subject to interception, and (3) [Plaintiff's] expectation was justified under the circumstances.")

[40] The statute notes that if so configured, the downloading is not a crime.  It does not matter if the operator of the site knew or intended that it be "readily accessible," simply that it was.

23. While the Affidavit in support of the warrant asserts that the Fox News streams were on "hidden URL's" (not publicized) and that Mr. Burke learned of the address of these URL's using the published password, the Affidavit also establishes that the streams were "configured so that such electronic communication is readily accessible to the general public" even if Fox News did not know it had been so configured. Indeed, the Eleventh Circuit recognized this possibility in *Snow*, noting:

> Through the World Wide Web, individuals can easily and readily access websites hosted throughout the world. Given the Web's ubiquitous and public nature, it becomes increasingly important in cases concerning electronic communications available through the Web for a plaintiff to demonstrate that those communications are not readily accessible. *If by simply clicking a hypertext link, after ignoring an express warning, on an otherwise publicly accessible webpage, one is liable under the SCA, then the floodgates of litigation would open and the merely curious would be prosecuted. We find no intent by Congress to so permit.* Thus, the requirement that the electronic communication not be readily accessible by the general public is material and essential to recovery under the SCA. *Cf. Aware Woman Ctr.*, 253 F.3d at 683-84 (treating the motive requirement of the Freedom of Access to Clinic Entrances Act ("FACE") as an essential element of a FACE claim because the motive requirement filters out conduct that Congress believes is not covered by FACE). (emphasis added).

24. At a minimum, if the government seeks to restrain the publication of Mr. Burke's reportage, *it must demonstrate that the live streams were not* configured to be readily accessible to the public.

5.   **The Materials Sought to Be Enjoined Are Burke's Own Reporting, NOT Materials Generated by the Government and Provided in Discovery**

25.  A Court has a general right to regulate discovery, and to regulate the use of materials disclosed in discovery, but that is not what is going on here.  The government here seeks to use the discovery process to restrict a journalists' publication of his pre-existing materials that pre-date the government's seizure in a classic prior restraint on publication. [41] In *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984) the Supreme Court affirmed the ability of the court to issue a protective order restricting a newspaper from publishing materials it only received in the course of civil discovery. The Court below narrowly tailored the protective order so that it did not apply to any information gained by means other than the discovery process itself. The Court recognized that where such protective orders impact First Amendment concerns, they are subject to heightened review. [42]

---

[41] *The News-Journal Corp. v. Foxman,* 939 F. 2d 1499, 1512 (11th Cir., 1991) ("The Supreme Court views prior restraints directed to the press with a heavy presumption against their constitutionality. See *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 570 (1976); *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (discussing the constitutional problems with prior restraints specifically against the press.")*Organization for a Better Austin v. Keefe*, 402 US 415 (1971); *Carroll v. Princess Anne*, 393 U. S. 175, 181 (1968); *Bantam Books, Inc. v. Sullivan*, 372 U. S. 58, 70 (1963).

[42] Accord, *Chicago Tribune Company v. Bridgestone/Firestone, Inc.,* 263 F. 3d 1304, 1311 (11th Cir. 2001)(a protective order sealing discovery materials from a third party newspaper must demonstrate that "the denial [of access] is necessitated by a compelling governmental interest, and is narrowly tailored to that interest." *Wilson v. Am. Motors Corp*., 759 F.2d 1568, 1571 (11th Cir.1985); see also *Brown v. Adv. Eng'g, Inc.*, 960 F.2d 1013, 1015-16 (11th Cir.1992). See also, *Commissioner, Alabama Dpt. Corr. v. Advance Local Media, LLC,* 918 F. 3d 1161, 1166 (11th Cir., 2019)(collecting cases on general right of access to discovery materials, particularly in criminal cases); *FTC v. AbbVie Products LLC*, 713 F. 3d 54, 67-68 (11th Cir., 2013); *Perez-Guerrero v. US Atty. Gen*., 717 F. 3d 1224, 1235, (11th Cir., 2013); *Callahan v. United Network for Organ Sharing,* 17 F. 4th 1356, 1361 (11th Cir., 2021).

26. As the *Seattle Times* Court noted, the "protective order prevents a party from disseminating only that information obtained through use of the discovery process. Thus, the party may disseminate the identical information covered by the protective order as long as the information is gained through means independent of the court's processes." *Id.* at 34.

27. Here, the government seized Mr. Burke's unique reporting, and now threatens to return it to him only if he agrees not to publish. This seizure was primarily designed to prevent Burke's publication of live streams of *publicly accessible* communications which are *the only copies* [43] of newsworthy, candid, on-camera conversations between Fox News hosts and others, many of which relate to *issues of critical importance for the 2024 election*. This may include[44] candid on-air but unbroadcast conversations regarding Fox News' commentators' opinions about the 2020 allegations of election fraud ("the Big Steal") in general, and the role of voting machines manufactured by entities like Dominion[45] and Smartmatic[46] (or, more accurately, the lack of the role of these machines) in the outcome of the 2020 election - all matters of great legal and public significance.

---

[43] "Live streams," are typically not recorded by the broadcaster, *and are therefore transient*.

[44] As the government suggests, they seized more than 87 GB of data and the government has made no *in camera* production of the files. Mr. Burke has been denied any opportunity to review his data for newsworthy content for more than a year. Therefore, he does not know the particular content of the files collected.

[45] *Dominion Voting Systems v. Fox News Network*, Dkt. No. N21C-03-257; N21C-11-082, Del. Super. Ct., 2023.

[46] *Smartmatic U.S. Corp. v. Fox Corp.*, 2024 N.Y. Slip Op. 30281 (N.Y. Sup. Ct. 2024)

Naturally, Fox News does not want this information reported on, and has enlisted the assistance of the Department of Justice in preventing these materials from being published. The proposed "protective order" motion is the government's means of effectuating this prior restraint on publication on behalf of Fox News, until the government itself decides it wants to publish the materials.[47]

### 6.     The Government Is Improperly Using Copyright Law to Effectuate A Prior Restraint on Publication

28. The government requests a prior restraint on publication because it asserts that the materials are copyrighted works. Indeed, almost all of the evidence here -- including Mr. Burke's own emails -- are technically copyrighted because they are "original works of authorship fixed in any tangible medium of expression." 17 U.S. Code § 102(a). Whether Burke's reporting use of the live streams, or indeed any of his research materials constitutes copyright infringement or permissible fair use *will depend on how he uses the information* - and is not grounds for a prior restraint on publication of that information. *See Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1263 (11th Cir.2001). To restrain publication of news because the news

---

[47] We do note that the government does not seek to restrain ITSELF from publishing those portions of the live streams it wants to publish in court to attempt to incarcerate Mr. Burke, nor does the government contend that the restrictions on copyright, privacy, or disclosure of allegedly unlawfully intercepted communications apply to the government. Thus, this is not an effort at protecting the privacy or dissemination of stolen information, but pure censorship. *Lewton v. Divingnzzo*, 772 F. Supp. 2d 1046, 1057 (D. Neb. 2011)("the court was unable to find any binding authority holding that an attorney who uses a communication intercepted in violation of the federal Wiretap Act is entitled to blanket immunity from Title III liability. The court did find persuasive authority to the contrary.")(citations omitted).

may be based on copyrighted information is wholly inconsistent with the fair use doctrine of copyright law. 17 U.S. Code § 107, and for the government (rather than the copyright holder) to enjoin a reporter from making fair use of a copyrighted work in order to prevent it from being published is unprecedented.   Indeed, it would permit the government to use copyright law to prevent dissent, criticism, or discourse.  It would be a clear violation of the First Amendment right of a journalist to publish relevant portions of newsworthy content under the "fair use" doctrine.

29. Indeed, this has been the consistent position of Fox News itself.[48] Fox News consistently rebroadcasts newsworthy information obtained from others; a practice universally accepted as lawful. *Eldred v. Ashcroft*, 537 US 186, 219-220 (2003);[49] *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 US 539 (1985); *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 US 562, 580 (1977); *Bollea v. Gawker Media*, LLC, 913 F. Supp. 2d 1325, 1326-27 (MD Fla. 2012)(denying injunction ordering Defendants to remove "the excerpts from the Hulk Hogan sex tape that were posted on the www. Gawker. com website") [50] In short, whether Mr. Burke's

---

[48] See, e.g., Fox Broadcasting Memorandum of Law in Support of Motion to Dismiss, ( Document 21 Filed 09/15/22) *Brody v. Fox Broadcasting* Case 1:22-cv-06249-DLC (S.D.N.Y); *New Jersey Media Group., v. Fox News Network, LLC, Dkt No.* 1:13-cv-07153-ER (Fox's Memorandum of Law in Support of Defendant's Motion for Summary Judgement, Document 35 Filed 06/30/14)(S.D.N.Y.)( arguing that Jeanne Pirro's use of Plaintiff's copyrighted photograph was "fair use")

[49] "17 U.S.C. § 107

[50] See also, *Gunder's Auto Center v. State Farm Ins.,* 617 F. Supp. 2d 1222 (MD Fla., 2009)

-- or anyone else's publication of newsworthy live video feeds of Fox News violates copyright law will depend on the traditional "fair use" factors contained in 17 U.S. Code § 107. [51]

**Conclusion**

30. By unilaterally labeling "reporting" as contraband, and thereby seizing it and only agreeing to return it if the reporter agrees not to publish it, the government is effecting a prior restraint on publication, and is attempting to enlist the Court's injunctive power to do so - without any hearing or showing of harm. Such an action is without precedent, and fails to meet the high standard established by the Supreme Court for prior restraint on publication. This court should not enjoin Mr. Burke's publication of materials seized from his newsroom which would be the net effect of issuing the protective order sought by the government.

Respectfully submitted,

s/Michael P. Maddux
Michael P. Maddux, Esquire
Florida Bar # 964212
Michael P. Maddux, P.A.
2102 West Cleveland Street
Tampa, Florida 32606
Phone: (813) 253-3363

---

[51] Moreover, applying the doctrine that a party cannot "publish" copyrighted works without the consent of the copyright holder would permit Mr. Burke to preclude the introduction at trial of the contents of any copyrighted emails, direct messages, tweets, or other publications, including the allegedly "stolen" Fox News live streams.

Fax: (813) 253-2553


s/Mark D. Rasch
Mark D. Rasch
Law Office of Mark Rasch
Member, MD, MA, NY Bar
MDRasch@gmail.com
(301) 547-6925
Admitted *Pro hac vice*


ATTORNEYS FOR TIMOTHY BURKE


**CERTIFICATE OF SERVICE**

I hereby certify that on **May 28, 2024**, a true and correct copy of the foregoing document is being electronically filed and will be furnished via CM/ECF to: Jay Trezevant, Esq. U.S. Attorney's Office Middle District of Florida Tampa Division 400 North Tampa Street Suite 3200 Tampa, FL 33602 at jay.trezevant@usdoj.gov.



s/Michael P. Maddux
Michael P. Maddux, Esquire
Michael P. Maddux, P.A.
2102 West Cleveland Street
Tampa, Florida 32606
Phone: (813) 253-3363
Fax: (813) 253-2553