## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No.** |
| **Plaintiff** | **8:24-CR-68-KKM-TGU** |
| **V.** | |
| **TIMOTHY BURKE,** | |
| **Defendant** | |

## DEFENDANT'S MOTION TO DISMISS INDICTMENT
## FOR FAILURE TO STATE AN ACTUAL VIOLATION OF CRIMINAL
## LAW AND INCORPORATED
## <u>MEMORANDUM OF LAW IN SUPPORT</u>

Comes Now, Defendant, Timothy Burke, by and through the undersigned counsel, and moves this court to dismiss the Indictment in this case for failure to state a crime as a matter of law, and for being unconstitutional on its face under the First Amendment and U.S. Supreme Court precedent. To be constitutionally adequate under the Sixth Amendment an Indictment must "contain the elements of the offense charged and fairly inform a defendant of the charge against which he must defend" and "enable [a defendant] to plead an acquittal or conviction in bar of future prosecutions

<1>

for the same offense." *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007). The instant charging document *omits key elements of the offenses*, and fails these tests. It also charges *conduct which is not criminal*, and other conduct which *cannot be made a crime* under the Constitution.

## I.    The Offense Conduct

Timothy Burke, an award-winning journalist and media consultant, is known for finding and reporting on information he finds in obscure and hidden areas of the Internet - often information that people do not know has been made public, and that they do not want to be exposed.[1] Indeed, Mr. Burke's unique form of journalism involves finding, disseminating, and reporting on the contents of thousands of live video feeds he locates on obscure but publicly accessible areas of the Internet. [2] Accessing and disseminating these publicly accessible - but hard to find -- live feeds is perfectly lawful, and is journalism.

### A.    "Hacking" Into the [https://matrix.liveu.tv](https://matrix.liveu.tv) website

---

[1] He also finds and publishes newsworthy information about live sports broadcasts (i.e. how NBA announcers from foreign countries call significant moments) and disseminates this information to his readers, subscribers and followers. Some of what he finds on the Internet are "live feeds" - streaming video content broadcast over the Internet by news organizations, sports leagues, politicians, governments, and others. While some of these live feeds are not public (they may require credentials to access, or may be encrypted and therefore are inaccessible), most of these live feeds are freely accessible online -- if you know where to find them. Indeed, there are thousands of such live feeds publicly accessible on the Internet.

[2] This reporting included finding and disseminating the live feeds from the 2023 State of the Union confrontation between Utah Senator Mitt Romney and then New York Rep. George Santos, and live feeds that revealed the NFL's response to Buffalo Bills safety Damar Hamlin who went into cardiac arrest on-field in Cincinnati on January 2, 2023.

<2>

The charges in the Indictment relate to several distinct categories - that Mr. Burke "conspired" to obtain credentials to access certain websites, that he used "compromised" credentials to access the website of an online video streaming service called LiveU.tv "without authorization," and that he "obtained information" as a result of this access -- namely a list of web addresses (called BIDs) of the live streams being streamed through the LiveU service. This, the Indictment alleges constitutes a violation of the Computer Fraud and Abuse Act, 18 USC 1030(a)(2)(C).

**B.    "Intercepting" Fox News' Live Broadcasts**

The Indictment next alleges that Burke used these web addresses to "intercept" (acquire the contents of) live video feeds being streamed through the LiveU service. While the Indictment does not say so, this relates to Burke's viewing of live feeds of interviews and related content involving Fox News Corporations' Tucker Carlson and his interview with Kanye "Ye" West - portions of which Fox later broadcast, but heavily edited to remove content that would be embarrassing to both West and Carlson. This, the Indictment alleges, violates the wiretap statute, 18 USC 2511.

**C.    Publishing the Fox News Outtakes**

The Indictment goes on to charge that Burke then provided the full Carlson/West

<3>

interview and other information from the live streams to other media outlets, who broadcast them to the public in a way that embarrassed Fox News and Tucker Carlson. This, the Indictment charges, constitutes the unlawful dissemination of the contents of a communication, with the knowledge that the communication had been unlawfully intercepted, in violation of 18 USC 2511.

### D.    Accessing the NBA FTP Server

Finally, the Indictment alleges that Mr. Burke, who as a sports media consultant worked with and for companies producing video content for NBA teams, used published credentials found online to access a File Transfer Protocol (FTP) website established by the NBA precisely for such purposes; and that he obtained information, namely short video clips of past NBA games or highlights (most of which are publicly accessible online from various sources like YouTube) This, the Indictment alleges, violates the CFAA as well.

## II.    Motion to Dismiss An Indictment

As a general rule, a court, pretrial, cannot determine the adequacy of the evidence in a criminal case, even where this will result in "legally meritless cases being sent to trial" *United States v. Salman*, 378 F.3d 1266, 1269 (11th Cir. 2004) unless there has been a stipulation by the parties as to what the facts will

<4>

show. [3] *United States v. Zayas-Morales*, 685 F.2d 1272 (11th Cir. 1982). [4] As the Seventh Circuit explained, *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988), there is a difference between a court finding a lack of evidence, and a court finding a lack of a crime, citing *Salman* but noting "[t]he district court found no violation and correctly dismissed the indictment, not because the government could not prove its case, but *because there was no case to prove.*" [5] This is the circumstance here.

In addition, where, as here, the charges relate to conduct the Supreme Court has held to be protected by the Constitution, (and is not a crime because it constitutes "pure speech") and conduct which the Supreme Court has held the statute does not apply, forcing the accused to go to trial on these charges inflicts an injury to his Constitutional rights under the First, Fifth, and Sixth Amendments. With this in mind, we address the charges.

---

[3] The government's most recent filing on July 9, 2024 (Doc. 63) lays out the facts and theory of prosecution under the CFAA and the wiretap statutes, and we accept at this juncture these facts as true. *See United States v. Mennuti*, 639 F.2d 107 (2d Cir.1981) (upholding dismissal of indictment where government had filed an affidavit making a full proffer of the evidence to be presented at trial); *United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir.2000) (court may not address the sufficiency of the government's evidence on a motion to dismiss unless there is a "stipulated record"); *United States v. Brown*, 925 F.2d 1301, 1304 (10th Cir.1991) ("[W]here the facts are essentially undisputed" it "is permissible and may be desirable ... for the district court to examine the factual predicate for an indictment to determine whether the elements of the criminal charge can be shown sufficiently for a submissible case.").

[4] In that case, the District Court found pretrial that, as a matter of law, that 8 U.S.C. § 1324(a)(1) applied only to unlawful aliens, and not to the defendants who were owners, captains, and crew members responsible for transporting the Cuban nationals to the United States.

[5] Illustrative is the most recent decision of the Supreme Court in *Trump v. United States*, 603 U.S. ____, Dkt. No. 23-939, July 1, 2024 (slip op. at 30) where the Court remanded the case to the District Court for specific factual findings *outside the scope of the Indictment* to resolve a claim of Presidential Immunity.

<5>

## III. The Supreme Court Has Barred Prosecution of Journalists For Willfully "Disclosing" the Contents of an Unlawfully Intercepted Communication.

The Indictment charges the unlawful dissemination of the contents of a communication, with the knowledge that the communication had been unlawfully intercepted, in violation of 18 USC 2511, but *Bartnicki* clearly bars prosecution of a journalist in these circumstances, even if the content was unlawfully obtained by Mr. Burke. The "disclosure" offense[6] makes it a crime to intentionally disclose or use, or endeavor to disclose or use, the contents of any wire, oral, or electronic communication, "knowing or having reason to know that the information was obtained through the acquisition of the contents of a wire, oral, or electronic communication in violation of this subsection."

Despite this language, "[t]he naked prohibition against disclosures is fairly characterized as a regulation of pure speech" *Bartnicki v. Vopper*, 532 U.S. 514, 526 (2001), and this is true even if the disclosure itself involved some "conduct" like transferring the file to a third party. *Id.* The "crime" here is journalism - disseminating truthful information to the public. Thus, the "disclosure" charges relate to conduct protected under the First Amendment which cannot support criminal charges. As the *Bartnicki* court went on to note:

> As a general matter, "state action to punish the publication of truthful information seldom can satisfy constitutional standards."

---

[6] 18 USC 2511(c) and (d)

<6>

> *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 102 (1979). More specifically, this Court has repeatedly *528 held that "if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need ... of the highest order." *Id.*, at 103; see also *Florida Star v. B.J.F.*, 491 U.S. 524 (1989); *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829 (1978).
>
> Accordingly, in *New York Times Co. v. United States*, 403 U.S. 713 (1971) (per curiam), the Court upheld the right of the press to publish information of great public concern obtained from documents stolen by a third party. In so doing, that decision resolved a conflict between the basic rule against prior restraints on publication and the interest in preserving the secrecy of information that, if disclosed, might seriously impair the security of the Nation.

Id., 532 U.S. at 527–28.

The Court noted that while the interception statute was intended to protect the privacy of the parties engaged in communication, "privacy concerns give way when balanced against the interest in publishing matters of public importance," *Id*. 532 U.S. at 534, and therefore, a person *could not be prosecuted for disseminating truthful information of public concern* even if the discloser knew that the material was illegally obtained. *Id.* The act of disclosing (distinguished from the "interception" itself) is pure and protected speech and cannot be criminalized. [7]

---

[7] Admittedly, in *Bartnicki*, the Court was concerned that a "*stranger's* illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern." Id at 535, (emphasis added) and while the journalist there knew that the conversations had been unlawfully intercepted, he did not personally "acquire the contents" of the conversation directly - he received them from a source. While this may implicate the wiretap charge itself, as to the "disclosure" count, *Burke's actions of publication remain pure speech, irrespective of whether he acquired the contents of the communications directly or indirectly.*

<7>

## IV.    The Substantive Wiretap Charges are Defective

In its most recent pleading (Doc. 63, p 2-3, fn.4) the government asserts that

> In the Eleventh Circuit, the elements of a violation of § 2511(1)(a) are
> that: (1) the defendant intentionally intercepted or endeavored or
> procured another to intercept; (2) the contents of a wire, oral, or
> electronic communication; (3) the defendant did so by use of a
> device; and (4) the interception of the communication was
> contemporaneous with the transmission of the communication. 18
> U.S.C. § 2511(1)(a). (citations omitted).

The Indictment proceeds along these lines as well. However, *this is NOT what the
wiretap law prohibits* - indeed, based on the broad definitions of "intercept" (to
acquire the contents of) the cited definition would make it a felony to watch TV,
have a SnapChat session, or have a Zoom meeting, each of which involves (1)
the use of a device to (2) acquire the contents of a communication (3) in
transmission. But these clearly are not crimes - although the Indictment and the
quoted language above would make them so.

To state a crime under 18 USC 2511 the Indictment must allege that the
communication was "uttered by a person exhibiting an expectation that such
communication is not subject to interception under circumstances justifying
such expectation." 18 USC 2510 (2). Not surprisingly, in light of the facts of this
case where the Fox News content originated in a television broadcast studio
with microphones and cameras recording the participants and other people
present, these elements do not appear in the Indictment or the government's

<8>

description of the offense. The wiretap charges are defective for failure to include this essential element.

## A. Interception of Oral Communications Requires Allegations That the Conversations Were Private and the Parties Neither Consented to Being Recorded, Nor Expected their Communications to Be Recorded

The federal wiretap law *does not make it a crime to use a device to acquire the contents of an oral communication.* It only makes it an offense if the conversation is acquired without the consent of at least one party, *and* the parties both have an expectation of privacy in that conversation *and* that expectation of privacy is objectively reasonable.[8] These are not mere defenses to a charge of wiretapping - *they are key elements of the offense* omitted from the charges. The government works severe damage to the First Amendment when it does not include these elements - such as prosecuting journalists for recording police misconduct in public, when they know that no offense occurred. [9] In the case at bar, the

---

[8] See, e.g., *Walker v. Darby,* 911 F. 2d 1573, 1579 (11th Cir., 1990); *Watkins v. LM Berry & Co.,* 704 F. 2d 577, 581 (11th Cir., 1983); *United States v. McKinnon,* 985 F. 2d 525, 527 (11th Cir., 1993) (no reasonable expectation that conversations would not be intercepted in the back of police car); *Kee v. City of Rowlett, Tex.,* 247 F.3d 206 (5th Cir., 2001),*rehearing denied, certiorari denied* 534 U.S. 892 (no unlawful wiretap when police use a device is used to pick up communications made by wiretapping a funeral urn to pick up conversations at grave site because the grave was outside and therefore there was no reasonable expectation that the urn would not be wired for sound)." Congress intended the definition of "oral communication" to "parallel the reasonable expectation of privacy test set out in" *Katz v. United States,* 389 U.S. 347 (1967)") *United States v. Curtis,* No. 11-60065-CR, 2011 WL 5037882, at *2 (S.D. Fla. Oct. 24, 2011), aff'd, 513 F. App'x 823 (11th Cir. 2013); "When a person has an "expectation that such communication is not subject to interception under circumstances justifying such expectation," it is an oral communication."*United States v. Wilson,* No. 04-20487-CR, 2005 WL 8167178, at *20 (S.D. Fla. May 10, 2005).
[9] See, *See, e.g.,. Glik v. Cunniffe,* 655 F.3d 78 (1st Cir. 2011); *Am. C.L. Union of Illinois v. Alvarez,* 679 F.3d 583 (7th Cir. 2012); *Turner v. Lieutenant Driver,* 848 F.3d 678, 687 (5th Cir. 2017); *Fordyce v.*

<9>

participants were in a television studio, facing cameras which were on, wearing lapel microphones, with boom microphones, ready to transmit their conversations worldwide. The government cannot "manufacture" a crime by omitting key elements from the charged offense.

**B.    The "Interception of Electronic Communications" Requires An Allegation that the Communications Were Not "Readily Accessible to the Public"**

In addition to the allegation that Burke ``intercepted'' oral communications, the Indictment alleges that he "intercepted" electronic communications "in transmission." This relates to Burke's alleged use of the web addresses ("BIDs"or URLs) that were automatically downloaded to him (the "information" allegedly unlawfully acquired under the CFAA) he used to watch the videos. [10] Here again, the Indictment fails to charge an offense by deliberately

---

*City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (First Amendment precludes the application of the wiretap statute to capturing information of public interest where there is no reasonable expectation of privacy by police.)

[10] In its most recent filing, (Doc. 63) the government asserts that the LiveU system allows customers to access previews of their live and recorded streams, and that these streams are identified by a complex and "insurmountably'' unguessable URL structure alongside an equally unguessable unique "BID." This is not contested, but is consistent with the fact that the URL and BID of *all of the users' live streams* was embedded as a compressed .JSON text file in that homepage, which is *automatically provided to all persons who log into the matrix.liveu.tv* website with demo or other credentials. Indeed, the Indictment's theory is that Burke ``hacked'' into the matrix server (he did not) to "steal" the list of obscure websites, and then logged into those websites without any credentials - a "but for" theory of criminality. "But for" the access to LiveU, Burke would not have known, and could not have guessed the website addresses. *Even if true, this does not change the fact that the live streams themselves were configured to be readily accessible*, and all one needed was to click the right link.

<10>

omitting critical elements of the offense of interception of electronic communications.

Put simply, the live video feeds allegedly "intercepted" *were publicly and readily accessible.* Further, the Indictment does not allege that they were not. Anyone with a browser and Internet connection and the Internet address could put that URL address into their browser and watch the videos. No user id or password was required. No special configuration. They were not encrypted. There were no limitations in "Terms of Use." To view the videos, you simply had to enter the right address into an internet browser and "click."

The apparent theory of the Indictment is ***NOT*** that the live feeds themselves were not "readily accessible," but that knowledge of where and how to find them was intended to be "secret." But that intent is irrelevant under the statute. In short, the addresses may be obscure, but if you found them, the live video was readily accessible. As such, the Indictment fails to allege a violation of the statute because it omits the key element of the wiretap statute - *that the communication itself be configured so that it is NOT readily accessible to the public.* Therefore, the Indictment is fatally defective.

As one court noted, "The question is not, however, whether *the networks* are "readily accessible to the general public," but instead whether the network is configured in such a way so that <u>the electronic communications sent over the network are readily accessible</u>." *In re Innovatio IP Ventures, LLC Pat. Litig.,* 886 F.

<11>

Supp. 2d 888, 892 (N.D. Ill. 2012)(emphasis added).[11] In *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1321 (11th Cir. 2006)[12] the Court warned against attempting to criminalize simply finding things on the Internet that were "readily accessible" even if hidden, and even if, as in the *Snow* case, they were *expressly prohibited,* noting:

> Through the World Wide Web, individuals can easily and readily access websites hosted throughout the world. Given the Web's ubiquitous and public nature, it becomes increasingly important in cases concerning electronic communications available through the Web for a plaintiff to demonstrate that those communications are not readily accessible. If by simply clicking a hypertext link, *after ignoring an express warning*, on an otherwise publicly accessible webpage, one is liable under the SCA, then the floodgates of litigation would open and the merely curious would be prosecuted. We find no intent by Congress to so permit. Thus, the requirement that the electronic communication not be readily accessible by the general public is material and essential to recovery under the SCA.

---

[11] The *Innovatio* court noted that the test is not whether people are aware that the network is configured to be readily accessible to the public, or intend it to be so configured, but whether the network is, in fact, so configured, noting that "The language of the exception does not, after all, refer to "communications that the general public knows are readily accessible to the general public." *Id.* 886 F. Supp. 2d at 893–94.

[12] See also, *Trump v. Clinton*, 626 F. Supp. 3d 1264, 1317 (S.D. Fla. 2022)("Plaintiff does not dispute the public nature of this data, and it would appear difficult to maintain an SCA claim based on public internet data); *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1200 (2022) ("Congress wanted to protect electronic communications that are configured to be private;" *MCGIP, LLC v. Does 1-14*, No. 11 C 2887, 2011 WL 13552528, at *3 (N.D. Ill. July 26, 2011)(intercepting communications through a BitTorrent site is lawful because "it appears that such file sharing is readily accessible to the general public, and accordingly is not protected under the ECPA"). *Jones v. Carranza*, No. 3:22-CV-00494-ART-CSD, 2023 WL 11830748, at *5 (D. Nev. Aug. 17, 2023)(police monitoring social media posts regarding a suspect involved in burglaries is lawful because sites "configured such that the electronic communication is readily accessible to the general public."); *Louis Vuitton Malletier, S.A. v. Akanoc Sols.*, Inc., No. C 07-03952 JW, 2008 WL 3200822, at *1 (N.D. Cal. Aug. 7, 2008)(citing *Snow*, 18 USC 2511 "does not "criminalize or create civil liability for acts of individuals who 'intercept' or 'access' communications that are otherwise readily accessible by the general public.")

<12>

In a civil context, *Snow* made it plain that asserting and proving that the communications were not "readily accessible" is essential to a charging document, and under the rule of lenity for a criminal case, the same is true. This is not a matter of notice or a problem that can be solved with a Bill of Particulars. Downloading unencrypted, publicly accessible, live video feeds from an obscure Internet address simply does not violate the statute, and the live feeds themselves do not become "contraband." "A hard-to-guess URL is still a URL, and the information posted at that address is still posted and accessible to the world." [13]

## V.     The Hacking Charges

The Indictment also alleges that Burke "accessed" the computer of LiveU.tv (called "StreamCo") by using "compromised credentials" (a userid and password) provided to him by the alleged co-conspirator. However, the term "compromised credential" is not a legal term, [14] and the "compromised credential" was actually a demonstration or "demo" credential of WGNS Radio, a CBS News Affiliate, posted to its own website, and archived by the public Internet Archive (or "Wayback Machine") for almost a year. It was WGNS's credential to do with as they like - and WGNS had the right to share it with the public -- which they did.

---

[13] Orin S. Kerr, Norms of Computer Trespass, 116 Colum. L. Rev. 1143, 1164–65 (2016)

[14] 18 USC 1029 speaks of stolen passwords as "counterfeit access devices" but the Burke Indictment chooses to eschew that definition because the passwords were not "stolen."

<13>



Thus, in context, the Indictment alleges that Burke used a credential *shared by its owner to a public website that was freely accessible.* The credential was not "hacked," "cracked," "guessed," or "compromised." It was shared to the public by its owner. The Indictment presupposes that the sharing of a password without restriction does not "authorize" persons to "use" that shared password. So, according the the government's view, the local Starbucks posting the SSID and password for their WiFi router would not "authorize" customers to access their wifi; a family member giving a Netflix password to a household member not named in the account would not "authorize" the recipient to "access" Netflix to watch a video. At least in the case of Netflix, such sharing violates Netflix's posted Terms of Service. Not so here. LiveU posted no Terms of Service.

<14>

This Indictment charges that Mr. Burke's use of the shared credentials is unlawful only by assuming an exceedingly narrow definition of "authorization" in the CFAA to mean, "not *expressly* authorized;" rather than the commonsense interpretation of authorization to include by course of conduct, implied authorization, or by common usage - the kinds of "authorization" common to physical trespass cases. Yet, the CFAA does not require the government's narrow approach to authorization, and the Indictment is therefore defective by assuming it in the "hacking" charges.

Citing *United States v. Valle,* 807 F.3d 508, 523 (2d Cir. 2015), the government posits that "merely having the ability to access a computer does not equate to authorization." The statement is undoubtedly true, and yet irrelevant, as the conduct alleged is not simply the ability (power or means) to access the computer. Rather, the issue is whether using a password shared by its owner can reasonably constitute implied authorization to use it. (Doc 53 at 3.). Indeed, in *Valle*, the Court reversed the defendant's conviction for "exceeding authorized access" noting:

> We reverse because section 1030(a)(2)(B) is ambiguous and where, as here, the Government and the defense both posit plausible interpretations of a criminal statute, the rule of lenity requires us to adopt the defendant's construction. As Justice Scalia has emphasized, "[w]hen interpreting a criminal statute, we do not play the part of a mindreader." When "a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the

<15>

statute," we resolve doubts in favor of the defendant rather than "imputing to Congress an undeclared will" to criminalize conduct. The rule of lenity ensures that criminal statutes will provide fair warning of what constitutes criminal conduct, minimizes the risk of selective or arbitrary enforcement, and strikes the appropriate balance between the legislature and the court in defining criminal liability.

*Valle*, at 523 (internal citations omitted). The government also likens Mr. Burke's use of a published demo password posted by its owner to the public Internet to the case of Robert Tappan Morris, [15] a Cornell University graduate student who wrote a "computer worm" designed to break into tens of thousands of computers, using multiple methodologies, including "a program of password guessing, whereby various combinations of letters are tried out in rapid sequence in the hope that one will be an authorized user's password, which is entered to permit whatever level of activity that user is authorized to perform." *United States v. Morris*, 928 F.2d 504, 506 (2d Cir. 1991).[16] The government here

---

[15] Mr. Burke's defense counsel was, as a Department of Justice attorney at the time, responsible for the *Morris* prosecution and was counsel of record and argued the appeal.

[16] As the government explained in its Second Circuit brief:

"the worm also attempted to gain access to other accounts on the network by "cracking" the passwords of legitimate users. The worm program contained a list of 430 words that it used as guesses for passwords on accounts. These were derived from the passwords that appellant had previously decrypted or cracked. The worm compared these words with the encrypted passwords stored in the computer's files. If they matched, the worm was able to gain access, posing as a legitimate user. If that did not work, it used the resources of the computer it was attempting to infect to encrypt each word in the on-line dictionary and compare it with the encrypted passwords in the system in an attempt to gain entry .

*United States v. Morris*, Brief of the United States of America, 1990 WL 10029998, at *8. (record citations omitted). This is a far cry from Mr. Burke's alleged use of a credential voluntarily published and shared by its owner.

<16>

relies on *Morris* for the proposition that "access gained by *guessing another entity's password* does not equate to authorized access…" Nobody claimed that it does, nor does the Indictment allege that anyone "guessed," "hacked," "brute-forced," "stole" or otherwise obtained the credentials unlawfully. *The credentials were posted online by their owner*, who also provided a handy hyperlink to the LiveU website and conveniently told people who wanted to use the password that it was "case sensitive" as an aid to logging in. Using them in these circumstances is simply not a crime.

## VI.    Downloading Information Without Express Permission

While the Indictment cites 18 USC 1030(a)(2)(c), that provision includes two separate offenses - accessing a computer without any authorization at all, or "exceeding" the scope of authorization granted. The Magistrate Judge authorizing the search warrant specifically commanded the searching agents to seize evidence of "downloading information without authorization" and the Indictment appears to follow this same rationale - that Burke's crime was obtaining the BIDs (web addresses) "without authorization."  The Supreme Court has firmly held that "downloading without authorization" is not a

<17>

violation of the CFAA - which is a "hacking" statute.[17] The Eleventh Circuit had consistently held that a person who downloads or accesses information in violation of established rules, or without permission, commits a crime under the CFAA.[18] The Supreme Court reversed this in *Van Buren* and abrogated these holdings. *Van Buren* now holds that "exceeds authorized access" and obtaining information, as used in 18 USC 1030(a)(2)(C) must be read narrowly, consistent with the anti-hacking purpose of the criminal statute, and the crime relates solely to the breaking into the computer - not the "authorization" to obtain the information.

In sum, the Indictment here - in the "unauthorized access" charges relating to both the matrix.liveu.tv website with its published credentials, and the NBA website with its published credentials,[19] presumes that "authorization"

---

[17] *Van Buren v. United States*, 593 U.S. 374 (2021). The 1984 House Report on the CFAA explained, "Section 1030 deals with an unauthorized access concept of computer fraud rather than the mere use of a computer. Thus, the conduct prohibited is analogous to that of 'breaking and entering.' " H.R. Rep. 98–894, 20, 1984 U.S.C.C.A.N. 3689, 3706. *In United States v. Nosal*, 676 F.3d 854, 857 (9th Cir. 2012) the Court rejected the government's theory that the statute prohibited the improper collection and use of information, noting that "the government's interpretation would transform the CFAA from an anti-hacking statute into an expansive misappropriation statute" and that "Congress enacted the CFAA in 1984 primarily to address the growing problem of computer hacking…" *Id.*, at 858. "The act was originally designed to target hackers who accessed computers to steal information or to disrupt or destroy computer functionality…" *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1130 (9th Cir. 2009).

[18] See, e.g., *United States v. Rodriguez*, 628 F.3d 1258, 1260 (11th Cir. 2010)(government employee using government computer for improper purposes); *Maye v. United States*, 769 F. App'x 882, 883 (11th Cir. 2019) (accessing the NCIC computer); *United States v. Van Buren*, 940 F.3d 1192 (11th Cir. 2019)(police officer's unlawful downloading of information from a crime database violates CFAA).

[19] The access to the NBA's FTP site was alleged to be "unauthorized" and similarly through "compromised credentials." Again, these allegedly compromised credentials were group shared credentials given by the NBA to hundreds of people for the purpose of providing access to a File Transfer Protocol (FTP) site designed to permit the sharing of information between sports media

<18>

requires the specific assent of the website operator - a position that is simply inconsistent with the way the Internet works and not required by the statute. Useful here is the Court's holding in *EarthCam, Inc. v. OxBlue Corp.*, 49 F. Supp. 3d 1210 (ND Ga., 2014) granting the defendant summary judgment on claims that the "[d]efendants violated the CFAA by using Chip Foley's password and username to access FCR's EarthCam account." The Court found that using the credentials of a third party - even if the operator did not consent to the use - did not constitute an "unauthorized access" to the site[20] where there was "no evidence that the OxBlue Defendants engaged in subterfuge or orchestrated a fraud on EarthCam" and "[t]he EULA did not prohibit EarthCam's customers from sharing their passwords with third parties."[21] The Court went on to conclude that "Because the OxBlue Defendants are entitled to summary judgment on EarthCam's CFAA claim, they also are entitled to summary judgment on EarthCam's claim that the Defendants conspired to violate the CFAA." [22]

---

personnel - uploading and downloading short video clips. As noted in our most recent filing, these consisted of short video clips of historical NBA games or interviews, many of which may have been uploaded from YouTube or other sources.

[20] The Court noted that "The Eleventh Circuit and the district courts within this Circuit have not yet addressed whether a defendant can be liable under the CFAA for using a third party's login credentials to access a customer account that a plaintiff would not otherwise authorize the defendant to use or access." Id.

[21] Accord, SecureInfo Corp. v. Telos Corp., 387 F.Supp.2d 593, 608 (E.D.Va.2005); State Analysis Inc. v. American Fin. Serv. Assoc. 621 F.Supp.2d 309, 316 (E.D.Va.2009); AtPac, Inc. v. Aptitude Solutions, Inc.,. 2:10294 WBS KJM, 2010 WL 1779901, at *6 (E.D.Ca. April 29, 2010).

[22] Citing, J. Kinson Cook of Georgia, Inc., 644 S.E.2d at 448 (quoting Mustaqeem–Graydon, 573 S.E.2d at 461)

<19>

A publicly accessible website - one with no "gate" to prevent access -- is just that, publicly accessible, even though the owner or operator provided no express consent or permission. People click links and access such sites routinely, and "authorization" is implied, just as in the "physical trespass" law for a host of "publicly accessible" locations - sidewalks, stores, shopping malls, and courthouses. *United States v. Phillips,* 477 F.3d 215, 219 (5th Cir.), *cert. denied*, 552 U.S. 820 (2007), [23]("Courts have therefore typically analyzed the scope of a user's authorization to access a protected computer on the basis of the expected norms of intended use or the nature of the relationship established between the computer owner and the user.").

However, "real world" analogies fail when it comes to the vagaries of the Internet, as there is, to paraphrase Gertrude Stein, "no there, there."[24] It is undoubtedly so that a person has no "authorization" to use an Internet resource

---

[23] Accord, this district's *Lockheed Martin Corp. v. L-3 Commc'ns Corp.*, No. 605CV-1580-ORL-31KRS, 2007 WL 569994, at *1 (M.D. Fla. Feb. 20, 2007)("There is no dispute whether the defendants in this case were authorized by Lockheed to access the computers and data at issue. Unlike the defendant in *Philips*, they were. The only point of contention is whether their alleged use of that access to pilfer trade secrets for Lockheed's competitors either exceeded or extinguished that authorization.").

[24] Stein, Gertrude, "Everybody's Autobiography" (Random House, 1937, p. 289); See also, Orin S. Kerr, Cybercrime's Scope: Interpreting "Access" and "Authorization" in Computer Misuse Statutes, 78 N.Y.U.L.Rev. 1596, 1619–21 (2003); Mark A. Lemley, Place and Cyberspace, 91 Cal. L.Rev. 521, 528–29 (2003).; David R. Johnson & David G. Post, And How Shall the Net Be Governed? A Meditation on the Relative Virtues of Decentralized, Emergent Law, in COORDINATING THE INTERNET 62 (Brian Kahin & James H. Keller eds., 1997); (arguing that the Internet is different from the physical world).

<20>

simply because they have the "ability" to do so. But just as the physical world has permitted uses without consent (and even in abrogation of consent) - such as easements by necessity, conservation easements, implied easements, etc., which permit access to physical property without express consent, the Internet has a *common practice of use which implies permission to access*.[25] "Accessing" a website is not a physical act, and it is not strictly a "trespass." By focusing on "express permission" to use the site, the Indictment attempts to criminalize a whole range of normal - and permitted - Internet behavior.

For example, in *United States v. Drew*, 259 F.R.D. 449, 454 (C.D. Cal. 2009) the government asserted that Drew, a 49-year-old woman, "hacked" the MySpace computers because she created a social media account in the name of a teenage boy, in violation of the MySpace rules which required a certification that "all registration information you submit is truthful and accurate; (b) you will maintain the accuracy of such information…" By not providing accurate information when registering her social media account she "accessed" the MySpace computer in Santa Monica "without authorization." Drew's prosecution, as Mr. Burke's here, is absurd,[26] and fails to recognize "the expected

---

[25] Physical analogies fail on the Internet and pouring old wine into new bottles changes both the wine and the bottle. Dan L. Burk, The Trouble with Trespass, 4 J. SMALL & EMERGING Bus. L. 1 (2000); Edward W. Chang, Bidding on Trespass: eBay, Inc. v. Bidder's Edge, Inc. and the Abuse of Trespass Theory in Cyberspace Law, 29 AIPLA Q.J. 445 (2001).

[26] The jury acquitted Ms. Drew of the felony charges, and the District Court dismissed the misdemeanor charges. https://storage.courtlistener.com/recap/gov.uscourts.cacd.415703.162.0.pdf The Government filed and then abandoned its notice of appeal to the Ninth Circuit.

<21>

norms of intended use" on the Internet. Using voluntarily shared passwords, like adopting a fictitious persona -- is not itself a crime, even if, as in Lori Drew's case, the website operator frowns on the activity.

If the statute is applied strictly, as this Indictment presumes, it would make it a crime for the tens of millions of people to share passwords to their Netflix or other media accounts; [27] anyone on a dating app who posts an inaccurate picture, lies about their weight or height, or even uses a pseudonym or internet "handle" instead of their real name could be federally prosecuted. [28] In short, this Indictment's interpretation of "without authorization" would make *criminals of countless users of the Internet,* and it will allow the government to do precisely what it has done here -- selectively prosecute persons, like Burke, a journalist, for exposing fraud or corruption or finding newsworthy information and/or engaging in provocative or unpopular speech.[29] People

---

[27] Jason Cohen, How to Get Around the Netflix Password-Sharing Ban (for Now), PC Magazine, February 24, 2024, available at https://www.pcmag.com/how-to/how-to-get-around-the-netflix-account-sharing-ban-for-now (last visited July 12, 2024)

[28] Michelle Drouin, Daniel Miller, Shaun M.J. Wehle, Elisa Hernandez, Why do people lie online? "Because everyone lies on the internet", Computers in Human Behavior, Volume 64 (2016) available at https://www.sciencedirect.com/science/article/pii/S0747563216304800

[29] Because of the government's request for a protective order, the defendant has not yet received discovery of the most critical information - the live feeds the government likely intends to introduce at trial. In addition, we have not been provided any information concerning the grand jury, including whether the grand jury, which returned an indictment which did not mention the names of any entities, was in fact informed of the names of the entities involved, like Fox News or Tucker Carlson - key information to evaluate credibility. As such, we reserve the right to file additional motions to dismiss based on potential prosecutorial or witness misconduct in the grand jury, should this be presented in discovery. *United States v. Jordan,* 316 F.3d 1215, 1249 n.68 (11th Cir. 2003); *United States v. Vallejo,* 297 F.3d 1154, 1164–65 (11th Cir. 2002); *Bank of Nova Scotia v. United States,* 487 U.S. 250, 256 (1988).

<22>

online share their own passwords all the time. They do so with the intent that these passwords be used by third parties, even if the website operators do not want this to happen. These are not "stolen" "hacked" or "cracked" passwords. They are not found on the "darkweb" or sites like "HaveIBeenPwned" which facilitate credential fraud and theft. They are found on what the government calls "Open Source" sources - e.g., Google. They are not "compromised" credentials, they are shared and public credentials. Using them is not a crime.

## VII.    The Conspiracy Charge

Finally, we address the conspiracy charges. Mr. Gaudino has pleaded guilty to them, but at the end of the day, the charge amounts to a "conspiracy to run a green light." Mr. Burke and Mr. Gaudino never met, never spoke, and indeed, Mr. Burke did not know Mr. Gaudino's name, location, or anything about him beyond his Twitter handle and their communications on that site. The conspiracy count essentially alleges that Burke and Gaudino [30] agreed (conspired) to *find publicly accessible passwords and use them* to log into websites, and to share the results of what they find. However, if the underlying conduct is not a crime, [31] then conspiring to engage in that conduct cannot be a crime. If the use of publicly shared passwords is not an offense, then an agreement to use

---

[30] We are aware of no other co-conspirators, and the Indictment does not suggest any others.
[31] See, e.g., *Snyder v. United States,* 144 S. Ct. 1947 (2024)(payments in reward for official conduct made after the fact do not violate the federal bribery statute)

<23>

them is similarly not an offense. We therefore ask that this Court DISMISS the

charges in the Indictment, or hold a hearing on this Motion at the Court's

earliest convenience.

Respectfully submitted,

Michael P. Maddux, Esquire
Florida Bar # 964212
Michael P. Maddux, P.A.
2102 West Cleveland Street
Tampa, Florida 32606
Phone: (813) 253-3363
Fax: (813) 253-2553


Mark D. Rasch
Law Office of Mark Rasch
Member, MD, MA, NY Bar
MDRasch@gmail.com
(301) 547-6925
Admitted *Pro hac vice*


COUNSEL FOR TIMOTHY BURKE

<24>

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of July 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system.


_s/Michael P. Maddux_
Michael P. Maddux, Esquire

<25>